*In the Matter of Frederick County Data Center Referendum Committee*, No. 67, September Term, 2025.

**FREDERICK COUNTY CHARTER – REFERENDUM – ZONING ORDINANCES**

Frederick County Council Ordinance 26-01-001 is not a "law" subject to referendum under § 308(a) of the Frederick County Charter. Under the Frederick County Charter, zoning ordinances that the County had authority to enact when it was a commission county are not subject to referendum.

**FREDERICK COUNTY CHARTER – PETITION SUFFICIENCY**

Maps depicting the location of a zoning overlay zone and zoning designations were in color in their original form as attachments to a zoning ordinance that was petitioned to referendum. For the petition, the maps were reproduced in black-and-white images that did not provide a full and accurate reproduction of important information, including the location of the overlay zone and zoning designations. Accordingly, the petition was insufficient, and the circuit court correctly enjoined the referendum.

Circuit Court for Frederick County
Case No. C-10-CV-26-000309
Case No. C-10-CV-26-000321
Case No. C-10-CV-26-000325
Case No. C-10-CV-26-000326
Case No. C-10-CV-26-000327
Argued:  June 30, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 67

September Term, 2025

---

IN THE MATTER OF FREDERICK COUNTY
DATA CENTER REFERENDUM
COMMITTEE

---

Fader, C.J.,
Booth,
Eaves,
Killough,
Harrell, Glenn T.
    (Senior Justice, Specially Assigned),
Raker, Irma S.
    (Senior Justice, Specially Assigned),
Getty, Joseph M.,
    (Senior Justice, Specially Assigned),

JJ.

---

Opinion by Fader, C.J.
Harrell, J., concurs.

---

Filed: July 24, 2026

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

We analyze whether an ordinance amending a comprehensive zoning plan to locate an approved overlay zone and alter the zoning designations of certain parcels is subject to referendum under the terms of the Frederick County Charter. We hold that it is not. We also hold that the underlying referendum petition was deficient because it failed to include a full and accurate reproduction of the ordinance at issue, as required by the Charter.

We observe at the outset that although the subject of the ordinance at issue is zoning for data centers, the subject of this lawsuit is not. The location and construction of data centers is a matter of significant controversy and consequence at this moment.[1] In deciding this case, this Court is not weighing in on that broader discussion, nor is it our place to do so. Instead, we address two straightforward legal issues involving the interpretation of the Frederick County Charter: (1) whether the Charter authorizes the submission of a zoning ordinance to referendum; and (2) whether the petition at issue satisfied the requirements of the Charter.

In 2025, the Frederick County Council enacted a law, Council Bill 25-09, providing for a Critical Digital Infrastructure, or "CDI," Overlay Zone that would permit the construction of data centers and supporting infrastructure on no more than one percent of County land. Bill 25-09 provided that the contours of the Overlay Zone would be established later "by ordinance," which occurred soon thereafter with the Council's

---

[1] *See, e.g.*, *Battles over data centers intensify in the State House and communities*, Maryland Matters (Apr. 20, 2026), https://marylandmatters.org/2026/04/20/battles-over-data-centers-intensify-in-the-state-house-and-communities/, *archived at* https://perma.cc/98KA-XE2M.

enactment of Ordinance 26-01-001 (the "CDI Ordinance"). An organized group of citizens called the Frederick County Data Center Referendum Committee, the appellant here, sought to petition the CDI Ordinance to referendum. After the Referendum Committee collected the requisite number of signatures, the Election Director of the Frederick County Board of Elections found the petition sufficient. Several entities and three County voters, the appellees here (the "Referendum Opponents"),[2] challenged that finding in the Circuit Court for Frederick County. They argued both that the CDI Ordinance is not subject to referendum under the Charter and that the petition did not meet the Charter's petition requirements because it did not contain a "full and accurate" reproduction of the challenged ordinance. The circuit court agreed with the Referendum Opponents on both issues.

The Referendum Committee noted a direct appeal to this Court pursuant to §§ 6-209(a)(3)(ii) and 6-210(e)(3)(2) of the Election Law Article. After expedited briefing and arguments pursuant to Election Law §§ 6-209(a)(4) and 6-210(e)(3)(ii), we affirmed the circuit court's judgment in a June 30, 2026 per curiam order. *In re Frederick County Data Ctr. Referendum Comm.*, ___ Md. ___ No. 67, Sep. Term, 2025, 2026 WL 1872645 (June 30, 2026). We now explain the basis for our order.

---

[2] The Referendum Opponents are Quantum Maryland, LLC, Joan Aquilino, Theodore H. Butz, Justin Cassity, Frederick Data Owner, LLC, NDR Properties, LLC, David S. Pleasants, Rowan Frederick LLC, Rowan Frederick II LLC, Rowan Frederick III LLC, and Windridge Properties L.C.

## BACKGROUND

### A.     Powers of Commission Counties and Charter Counties

There are three forms of local county government in Maryland:  charter home rule; code home rule; and commission. *Baltimore City Bd. of Elections v. Mayor & City Council of Baltimore*, 489 Md. 465, 477 (2025).  In 2014, Frederick County transitioned from a commission county to a charter home rule county.  Our resolution of the present dispute requires an understanding of both some of the zoning powers Frederick County possessed as a commission county and the self-governance powers it gained as a charter county.

Counties that have not adopted home rule are commission counties.  *Id.* at 478; *see* Md. Code Ann., Local Gov't § 1-101(d) (2013 Repl.; 2025 Supp.).  Commission counties are governed by a Board of County Commissioners, *see* Md. Const. art. VII, § 1; Local Gov't §§ 1-101(f)(4), 9-401, which may exercise only those powers that are expressly conferred by statute or that may reasonably be implied from such statutes, *see Miller v. County Comm'rs of Carroll County*, 226 Md. 105, 114 (1961).  The General Assembly retains the power to legislate for commission counties, including by passing public local laws.  A Board of County Commissioners may, however, enact ordinances on certain matters where authorized by statute.  One such area is zoning, pursuant to provisions codified in the Land Use Article.  *See, e.g.*, Md. Code Ann., Land Use § 1-101(g)(2)(i) (2012 Repl.; 2025 Supp.) (defining "legislative body" to include a board of county commissioners); § 4-101(a)(2) (declaring State policy that "planning and zoning controls

3

shall be implemented by local government"); §§ 4-102 – 4-103 (identifying zoning powers of local legislative bodies).

Public local laws enacted by the General Assembly for commission counties are subject to the referendum power contained in Article XVI, § 3(a) of the Constitution of Maryland. There is no provision in Maryland law authorizing the submission to referendum of zoning ordinances enacted by commission counties.

Before 2014, the County was a commission county. As such, it was subject to public laws enacted by the General Assembly, both public local laws applicable only to the County and public general laws. *Cf. Ritchmount P'ship v. Bd. of Sup'rs of Elections for Anne Arundel County*, 283 Md. 48, 57 (1978). The Board of County Commissioners had no authority to enact either type of public law. *Cf. Miller*, 226 Md. at 114. It did, however, manage the County's land use and zoning pursuant to the Land Use Article and its predecessor, former Article 66B. *See, e.g.*, Land Use §§ 2-101 – 2-105 (concerning the establishment and operation of planning commissions); §§ 3-101 – 3-304 (concerning the development, adoption, and implementation of comprehensive plans); §§ 4-101 – 4-504 (concerning zoning). Pursuant to that authority, the County Commissioners enacted zoning ordinances that were subject to judicial review. *See id.* §§ 4-401 – 4-406 (governing judicial review of zoning decisions).

Effective December 1, 2014, the County became a charter county. We recently summarized the sources of the legislative powers available to a charter county as follows:

[A charter county's] legislative authority is provided by the Home Rule Amendment, Article XI-A of the Constitution of Maryland; and the Express Powers Act, Title 10 of the Local Government Article. Article XI-A authorizes the "transfer [of] the General Assembly's power to enact many types of county public local laws to the . . . home rule counties." *McCrory Corp. v. Fowler*, 319 Md. 12, 16 (1990), *superseded by statute as stated in Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 627-29 (2010).

Article XI-A provides a structure for the interplay between State and local power. Section 2 of Article XI-A directs the General Assembly to "provide a grant of express powers" for charter counties. Section 3 provides the County Council of a charter county with the "full power to enact local laws . . . upon all matters covered by the express powers granted" by the General Assembly, and further provides "that in case of any conflict between said local law" and any general law enacted by the General Assembly, the general law "shall control." Section 4 then prohibits the General Assembly from enacting local laws "on any subject covered by express powers granted." Taken together, these sections authorize a shift of authority to legislate on "matters of purely local concern" from the General Assembly to charter counties. *State v. Stewart*, 152 Md. 419, 422 (1927).

The General Assembly carried out its charge under § 2 of Article XI-A by adopting the Express Powers Act, which "endows charter counties with a wide array of legislative and administrative powers[.]" *Angel Enters. Ltd. P'ship v. Talbot County*, 474 Md. 237, 261 (2021) (alteration in original) (quoting *Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel County*, 283 Md. 48, 57 (1978)).

*Engage Armament LLC v. Montgomery County*, 494 Md. 1, 32-33 (2026).

Section 10-102(a) of the Express Powers Act "authorizes charter counties to exercise express powers," which are laid out in subtitles 2 and 3 of the Act. *See Prince George's County v. Thurston*, 479 Md. 575, 601 (2022) (discussing Local Gov't §§ 10-102(a), 10-201 – 10-206, and 10-301 – 10-330). One of those enumerated powers permits charter counties to "enact local laws relating to zoning and planning to protect and promote public safety, health, morals, and welfare[.]" Local Gov't § 10-324(a). In addition

5

to the powers that are expressly enumerated, a "county council may pass any ordinance, resolution, or bylaw not inconsistent with State law that: (1) may aid in executing and enforcing any power [specified in the Express Powers Act]; or (2) may aid in maintaining the peace, good government, health, and welfare of the county." *Id.* § 10-206(a).

Section 9-205 of the Local Government Article expressly authorizes voters of a county, in adopting a charter, to "reserve . . . the power of referendum by which they may submit a local law enacted by the county council, by petition, to the voters for approval or rejection." *Id.* § 9-205(a)(1). A charter that reserves this authority is required to specify the types of local laws that may be petitioned to referendum. *Id.* § 9-205(a)(2).

## B. The Frederick County Charter

The County began the process of transitioning to a charter county in 2011. A nine-member Charter Board drafted a proposed charter and submitted it to the Board of County Commissioners, which approved it for referendum. The voters of the County adopted the proposed charter at the 2012 General Election, and it became effective on December 1, 2014. Frederick County, Md., Charter § 802.

The Charter contains eight articles that set out general provisions (Article 1); create a legislative branch, the County Council (Article 2); establish requirements for the legislative process (Article 3); create an executive branch under a County Executive (Article 4); govern budget and finance (Article 5); address land use (Article 6); include miscellaneous provisions (Article 7); and address transition issues (Article 8). Most relevant here are Articles 2, 3, and 6.

6

## *1.  Legislative and Referendum Powers Under Articles 2 and 3*

The Charter vests in the County Council "[a]ll the legislative powers which the County may exercise under the Maryland Constitution and laws of the State[,]" subject to the power of referendum "retained by the people of the County as set forth in Section 308 of this Charter." Charter § 202. In accordance with those legislative powers, "the Council may enact public local laws for the peace, good government, health, safety or welfare of the County and on all subjects that have been delegated to the County under the Maryland Constitution and by the laws of the State." *Id.* § 301. The Council may also "repeal and amend" those public local laws the General Assembly had previously enacted for the County when it was a commission county. *Id.*

In describing the County Council's legislative authority, the Charter references laws, ordinances, and legislation, but does not define any of those terms. As noted, § 301 authorizes the enactment of "public local laws." Section 305, titled "Enactment of Legislation," provides that the "Council may enact no law except by written Bill." *Id.* § 305(a). "Bill" is defined in Article 1 as "any proposed act of the County Council resulting in a law or ordinance[,]" but not a resolution. *Id.* § 104(c). Section 306 defines the County Executive's veto authority over "any legislation." *Id.* § 306(a). Section 307 addresses the effective date for "laws," providing that all laws other than the Annual Budget and Appropriations Ordinance and expedited legislation "shall take effect sixty calendar days after enactment" unless a later date is specified. *Id.* § 307(a).

The power of referendum is set out in § 308, which provides that "a law, or part of a law, enacted pursuant to this Charter may be referred to the voters for approval upon the filing of a petition signed by seven percent of the registered voters of the County[,]" with four exceptions: (1) laws imposing taxes; (2) laws appropriating funds for current expenses; (3) laws prescribing council districts; and (4) laws adopting a compensation review commission. *Id.* § 308(a). A referendum petition "shall meet the requirements of State law and may consist of several papers, but each paper shall contain the full and accurate text of the law, or part of the law, that is subject to the petition." *Id.* § 308(b). Petitions must be filed with the County Board of Elections "[n]o later than fifty-nine days following the date a law is enacted[.]" *Id.* § 308(c). If properly referred to the voters, the challenged law or portion of a law does "not take effect until thirty days after approval by a majority of voters." *Id.* § 308(d).

### 2. *Land Use Under Article 6*

Article 6 of the Charter consists of a single section, § 601, titled "Adoption of Land Use Article of the Annotated Code of Maryland[.]" Subsection (a) explains the policy behind the "adoption" of the Land Use Article, stating that it is the County's policy "that the provisions of the Land Use Article . . . that governed land use in the County prior to the Effective Date of this Charter shall continue to apply as if they have been codified in the Code of Public Local Laws of Frederick County on the Effective Date of the Charter." *Id.* § 601(a). Subsection (b) requires that "[b]y 2016 the provisions [of the Land Use Article] that were considered applicable to the County on the Effective Date of the Charter shall be

8

codified in the Code of Public Local Laws of Frederick County." *Id.* § 601(b). And subsection (c) requires that any future revisions to the Land Use Article that would have applied had the County remained a commission county "be promptly adopted by the County and codified in the Code of Public Local Laws of Frederick County." *Id.* § 601(c).

### C. Data Center Workgroup and Resulting Council Actions

In 2022, through Bill 22-05, the County Council amended Chapter 1-19 of the Frederick County Code to add "Critical Digital Infrastructure," i.e., data centers, as a new use. *See* Frederick County, Md., Bill 22-05. The Bill: (1) defined CDI facilities and their electric substations; (2) established those facilities and substations as principal permitted uses in two zones, the Limited Industrial and General Industrial zones, subject to site development plan approval; (3) established applicable regulations; and (4) instituted required design elements (e.g., minimum lot area). Bill 22-05; *see also* Frederick County, Md., Code § 1-19-11.100 (definitions); § 1-19-5.310 (use table); § 1-19-6.100 (design requirements); §§ 1-19-8.402 – 1-19-8.403 (CDI regulations) (2022).

The following year, Frederick County Executive Jessica Fitzwater created the Frederick County Data Centers Workgroup "to examine existing laws and to provide thoughtful guidance on shaping growth of" data centers, which was recognized as "a relatively new and rapidly changing technology industry poised for expansion in Frederick County." *Report of the Frederick County Data Centers Workgroup*, at 1 (2024). The Workgroup met publicly eight times over six months and ultimately recommended, among other things, zoning amendments. *Id.* at 3-4, 6-17.

One such proposed amendment was to create a CDI floating overlay zone. *Id.* at 7. To the Workgroup, such a floating zone "would be applicant driven and would meet the criteria and standards for siting as established by the County through the existing CDI ordinance, or an amended or replacement ordinance." *Id.* at 8. An application for such a designation would include "significant public notice and input[,]" including public hearings by the Frederick County Planning Commission, and public hearings and approval by the County Council. *Id.* The Workgroup also suggested that "the County Executive and County Council may wish to consider establishing an overall upper limit on data center development in Frederick County[.]" *Id.*

In May 2025, the County Executive and Council "announced a compromise to limit where data centers can be built to the area around the old East Alco[] property north of Adamstown[,]" and to limit development "to less than 1% of the County's total land mass[.]" Frederick County Off. of the County Exec., *Legislation Introduced to Limit Data Centers* (May 6, 2025), https://frederickcountymd.gov/CivicAlerts.aspx?AID=5555&ARC=8580, *archived at* https://perma.cc/4S25-CPDC. The announcement explained that the compromise would proceed in two phases. First, the County Council would co-sponsor a bill introduced by the County Executive that would contain "a text amendment to the zoning code to create" the overlay zone. *Id.* The County Council would "review and vote on the bill through its ordinary public legislative process." *Id.* Second, the Division of Planning and Permitting would "develop a map through an open and transparent public process, which will be

10

presented to the Planning Commission for review and the County Council for approval."

*Id.*

True to the announcement, the County Council advanced Bill 25-09 the following month to create the CDI Overlay Zone, a zoning designation intended to direct data centers and associated electric substations "to industrial lands in proximity to data conveyance infrastructure and other industrial uses, while minimizing impacts to non-compatible uses[.]" Bill 25-09. To accomplish that, the Bill made several changes to the Frederick County Code. Among other things, Bill 25-09:

- amended the use table in § 1-19-5.310 of the Code to add zone CDI-OZ;

- amended § 1-19-8.402 of the Code, which addresses zoning of CDI facilities, to recognize the new CDI Overlay Zone. Among other things, subsection 8.402 restricts the establishment of CDI to areas with zoning designations of Limited Industrial or General Industrial located within the CDI Overlay Zone, mandates minimum setbacks of 500 feet for CDI facilities abutting land zoned Residential, and requires applicants to demonstrate that they will minimize the impact of their development to the maximum extent practicable with respect to visual impact, impact on certain other types of local properties, impact on fragile ecosystems and watersheds, impact on recreational amenities and parks, and impact on "overburdened communities and underserved communities";

- amended § 1-19-8.403 of the Code, which addresses CDI electrical substations, to recognize the new CDI Overlay Zone and limit such substations to tracts within that zone;

- enacted a new § 1-19-10.1100 of the Code to establish the CDI Overlay Zone. That subsection authorizes the County Council to create a CDI Overlay Zone "with the boundaries established by ordinance and identified on the Zoning Map[,]" limited to "lands with a comprehensive plan land use designation of Limited Industrial (LI) or General Industrial (GI) uses." *Id.* § 1-19-10.1100(B)(1), (2). The new subsection required the Council to "consider proximity to schools, colleges and universities, daycare centers, healthcare

11

facilities, and residential uses[,]" and limited the Overlay Zone to "less than 1% of the total land area of the County." *Id.* § 1-19-10.1100(B)(3), (4).

The Council enacted Bill 25-09 on September 2, 2025, and the County Executive approved it ten days later. Bill 25-09. As required under Charter § 307(a), the Bill was given an effective date of November 1, 2025, 60 days after the date of its adoption. *Id.*

Following the adoption of Bill 25-09, the Frederick County Planning Commission certified a comprehensive plan amendment to the County Council, which held two days of public hearings on the plan amendment and proposed rezoning. The County Council approved amendments to the plan and directed preparation of a rezoning ordinance that would effectuate the changes and establish the contours of the Overlay Zone. County Council of Frederick County Meeting Minutes, Dec. 23, 2025, https://www.frederickcountymd.gov/Archive.aspx?AMID=112#docaccess8cb65518b, *archived at* https://perma.cc/8ATT-SFDM.

After conducting public hearings and receiving comments and other correspondence, the County Council enacted both Resolution 26-01, which adopted the comprehensive plan amendment; and the CDI Ordinance, which amended the zoning boundary map to (1) locate the Overlay Zone and (2) identify the zoning designations of parcels within and immediately surrounding the Overlay Zone. In effect, the Overlay Zone would act as a floating zone in which properties located within it would "continue to have a base zoning designation, such as Agricultural or Limited Industrial, and property owners can continue to use their property in accordance with their zoning." Livable Frederick Planning & Design Off., Frederick County, Md., *Critical Digital Infrastructure Overlay*

12

*Zone: An Amendment of the Livable Frederick Comprehensive Plan*, at 1 (2025). However, property owners with property designated Limited Industrial or General Industrial within that floating zone would now have the option to pursue data center development. *Id.*; *see* Frederick County, Md., Code § 1-19-10.1100(B)(6)(a) ("Individual zoning map amendments for properties located within the Critical Digital Infrastructure Overlay Zone shall be subject to the approval criteria" in the County Code).

The CDI Ordinance recited that the Planning Commission had "engaged in a comprehensive review of the zoning and land use designations of the properties within the [CDI] Overlay Zone Planning Area[,]" and that property owners and planning department staff had "requested changes to zoning and land use designations of numerous properties within the Planning Area[.]" Frederick County, Md., Ord. 26-01-001. The Ordinance also recited the procedure that the Council had followed in considering the recommendations and extensive feedback, and that the Council had determined that the changes set forth in two maps attached as an exhibit were consistent with the comprehensive plan. *Id.* The Council therefore "enacted and ordained" the "zoning and land use designation" set forth on the attached exhibits, which contained two maps. *Id.* (citation modified). The first map, titled "Council Adopted Critical Data Infrastructure (CDI) Overlay Zone," depicts the boundaries of the CDI Overlay Zone, encompassing approximately 2,614.9 acres, marked by a bold yellow line. The second map, titled "Council Adopted Zoning," covers the same geographic area and identifies the zoning of properties on it using 10 different colors. The maps, each of which was attached to the Ordinance on full 8 1/2 by 11-inch pages, are:

13



## Council Adopted
## Critical Data
## Infrastructure (CDI)
## Overlay Zone

☐ Council Adopted CDI Overlay Zone

| CDI Acres | CDI % of County |
|-----------|-----------------|
| 2,614.9 | 0.61 |

Projection: NAD 1983 State Plane Maryland FIPS 1900 Feet.While efforts have been made to ensure the accuracy of this map, Frederick County accepts no liability or responsibility for errors, omissions, or positional inaccuracies in the content of this map. Reliance on this map is at the risk of the user. This map is for illustration purposes only and should not be used for surveying, engineering, or site-specific analysis. Printed 1/5/2026

0    0.25    0.5    1 Miles

N

MAPID:S40



## Council Adopted Zoning

Frederick County, Maryland
Division of Planning and Permitting

☐ A – Agricultural
🟩 RC – Resource Conservation
🟨 R1 – Low Density Residential
🟧 R3 – Low Density Residential

🟥 PUD – Planned Unit Development
🟥 VC – Village Center
🟪 GI – General Industrial
🟪 LI – Limited Industrial

▨ MM – Mineral Mining
🟦 Ie - Institutional

Projection: NAD 1983 State Plane Maryland FIPS 1900 Feet.While efforts have been made to ensure the accuracy of this map, Frederick County accepts no liability or responsibility for errors, omissions, or positional inaccuracies in the content of this map. Reliance on this map is at the risk of the user. This map is for illustration purposes only and should not be used for surveying, engineering, or site-specific analysis. Printed 1/5/2026

0    0.1  0.2    0.4 Miles

N

14

A comparison of the two maps showed the inclusion of areas designated Agricultural, Limited Industrial, and General Industrial within the Overlay Zone, and areas with those same designations, as well as areas designated Resource Conservation, Residential, Planned Unit Development, Village Center, Mineral Mining, and Institutional just outside of the Overlay Zone.

Both the Resolution and the CDI Ordinance were adopted by the Council on January 20, 2026 and made effective that same day. Neither was presented to the County Executive for approval.

Also on January 20, the Frederick County Attorney advised the County Executive and Council that neither the Resolution nor the CDI Ordinance was a "law" subject to referendum under the Charter. According to the County Attorney, since Frederick County became a charter county, "the Council has never treated resolutions or ordinances as 'laws' subject to the formal Bill process or to referendum." From our review, it appears that the County Council has acted consistent with the County Attorney's representation since the Charter took effect. As reflected on the County Council's website, it categorizes its actions as Bills, Ordinances, and Resolutions. *County Council*, Frederick County Gov't, https://www.frederickcountymd.gov/591/County-Council, *archived at* https://perma.cc/ZXR5-9N98. Bills—which appear to exclusively concern changes to the County Code—all follow the process laid out in Article 3 of the Charter, including bearing effective dates at least 60 days after their adoption by the Council and presentation to the

15

County Executive for approval.[3]  Ordinances, by contrast, including all matters relating to specific zoning decisions, do not appear to follow the Article 3 process.[4]  Although some ordinances reflect that they were sent to the County Executive for approval, *see, e.g.*, Ordinance 19-02-002, all the ordinances we reviewed—other than the Annual Budget and Appropriations Ordinance, which is required to have an effective date of "the first day of the fiscal year," Charter § 307(a)—are identified as becoming effective the same day they were adopted.  Matters addressed by resolution also do not appear to follow the process set forth in Article 3 of the Charter.[5]

## D. Referendum Petition & the Election Director's Certification

The day following the Council's adoption of the CDI Ordinance, the Referendum Committee submitted a draft referendum petition to the Frederick County Board of Elections for an advance determination of petition sufficiency.  *See* Md. Code Ann., Elec. Law § 6-202(a)(1) (2022 Repl.) ("The format of the petition prepared by a sponsor may be submitted to the chief election official of the appropriate election authority, in advance of

---

[3] *See, e.g.*, Bill 26-01; Bill 26-02; *see also Council Bills 2026*, Frederick County Gov't, https://frederickcountymd.gov/9176/Council-Bills-2026, *archived at* https://perma.cc/TN2Q-DWL6 (listing and linking to recent Bills).

[4] *See, e.g.*, Ordinance 16-01-001; Ordinance 19-02-002; *see also County Council Ordinances*, Frederick County Gov't, https://www.frederickcountymd.gov/Archive.aspx?AMID=122, *archived at* https://perma.cc/S573-AFU3 (listing and linking to all historical County ordinances).

[5] *See, e.g.*, Resolution 15-01; Resolution 17-05; Resolution 21-20; *see also County Council Resolutions*, Frederick County Gov't, https://www.frederickcountymd.gov/Archive.aspx?AMID=123, *archived at* https://perma.cc/EF3N-VKK7 (listing and linking to all historical County resolutions).

16

filing the petition, for a determination of its sufficiency."). The petition included a form signature page provided by the State Board of Elections and a black-and-white reproduction of the two-page ordinance and its two exhibits. All four pages were reduced in size and reproduced on a single page to fit on the opposite side of each petition signature page, as follows:



Council Adopted
Critical Data
Infrastructure (CDI)
Overlay Zone



Council Adopted Zoning

The County Election Director provided an advance determination that the petition was "sufficient as to format only."

The Referendum Committee provided volunteer petition circulators with in-person training and a training manual. In addition to the petitions, the Committee required all circulators to have both (1) a physical copy of the full text of the CDI Ordinance and (2) a QR code that linked to the CDI Ordinance on the County website. The circulators were also provided with a checklist, which reminded them to ensure that each voter was aware of the ordinance being referred for referendum and to have the full CDI Ordinance available to read.

In March 2026, the Referendum Committee timely submitted to the Board of Elections the referendum petition with 24,053 signatures. The Board of Elections reviewed and validated 21,029 of those signatures, enough to comfortably exceed the seven percent threshold set by the Charter. In a one-page letter to the Committee, the Election Director stated that she had reviewed the petition for compliance with § 6-206(c) of the Election Law Article. That provision sets out potential deficiencies that require a chief election official to "declare that the petition is deficient," including if it is untimely, does not meet signature requirements, does not meet form requirements, is not on a subject authorized for referendum, or fails to meet other legal requirements. The Election Director determined that the petition was not deficient in all areas but one, which was whether "the use of a petition for the subject matter of the petition is not authorized by law[.]" *See* Elec. Law § 6-206(c)(5)(i). On that issue, the Election Director stated that she was unable to reach a

19

determination either way. However, relying on a so-called "presumption of sufficiency," the Election Director concluded that because she was "unable to make a determination of a deficiency, the petition is sufficient[.]"

### E.     Judicial Review & Declaratory Judgment in the Circuit Court

Over the next week, the Referendum Opponents filed in the Circuit Court for Frederick County petitions for judicial review of the Election Director's certification of the referendum petition. The Referendum Opponents also sought declaratory relief concerning the sufficiency of the petition and, alternatively, a writ of mandamus ordering the Election Director to make a proper determination as to whether the CDI Ordinance was subject to referendum. The Respondents-Defendants in the actions were the Referendum Committee, the Board of Elections, and the Election Director. The circuit court consolidated the petitions and heard them together.

The Referendum Opponents first argued that the CDI Ordinance is not a "law" subject to referendum under the Charter, nor was it enacted "pursuant to" the Charter for purposes of § 308(a). They also argued that the referendum petition was insufficient because, among other reasons, it did not include the "full and accurate text" of the law as required by § 308(b). The Referendum Opponents contended that the small size of the text of the Ordinance and the use of black-and-white, rather than color, maps rendered the reproduction less than full and accurate. The Referendum Committee, Board of Elections, and the Election Director responded that the CDI Ordinance is a law subject to referendum, that it was enacted pursuant to the Charter, and that the petition was sufficient.

20

In addition to hearing legal argument, the circuit court admitted thousands of pages of evidence, including the petition signature pages and numerous documents related to the petition drive, and heard testimony from witnesses, including Mr. Steve Black, the co-chair of the Referendum Committee. During questioning by counsel for the Referendum Opponents, Mr. Black agreed that it was necessary to refer to the maps "to fully understand the meaning and import of the ordinance[.]" He also agreed that the black-and-white reproductions of the maps on the printed petitions made it difficult to tell what color was designated to each zone on the zoning map. And he acknowledged that the Committee thought "extensively" about whether to use color or black-and-white maps, and had been urged by some supporters to use color maps. Presented with numerous petitions in the record, Mr. Black conceded that none were fully legible.

The circuit court ruled in favor of the Referendum Opponents. The court first concluded that the CDI Ordinance was not a "law" subject to referendum under the Charter. The court concluded that the plain language of the Charter was ambiguous but resolved the ambiguity using legislative history. Specifically, the court found persuasive the views expressed by members of the Charter Board during a meeting in December 2011. At that meeting, after discussion, the members declined to include zoning as an express exception from the referendum power only so as not to, in the words of the circuit court, "confuse the public into thinking anything about land use was changing." According to the Charter Board members, by adopting the land use provisions in the Maryland Code that then applied to the County, nothing about zoning would change, rendering an express exception

for zoning irrelevant. Instead, the Charter Board elected to highlight the adoption of the Land Use Article prominently in the Charter. The court thus distilled from the members' comments that "the Charter Board decided to continue the practice in Frederick County of not allowing referendums on zoning matters" but to not include an express exception for zoning to avoid confusing the public.

The court also concluded that the petition was legally deficient because it failed to contain the "full and accurate text" of the CDI Ordinance, as required by Charter § 308(b). Because "[k]nowing where the computer data centers may be located is critical to understanding" the CDI Ordinance, the court found "the Referendum Committee's failure to include the colorized maps in its petition to be fatal to its attempt to bring [the CDI Ordinance] to referendum."

Accordingly, the circuit court issued an order that (1) reversed the Election Director's decision to certify the CDI Ordinance for referendum; (2) declared that, "pursuant to the Charter of Frederick County, [the CDI Ordinance] is not a subject matter about which a referendum may be pursued;" and (3) declared "that the Frederick County Data Center Referendum Committee's referendum petition is deficient pursuant to" Election Law § 6-206(c)(6) "because it fails to provide a 'full and accurate text of the law' as required by *Frederick County Charter, Article 3, § 308(b)*[.]"

The Referendum Committee noted a direct appeal to this Court. The Board of Elections and the Election Director did not appeal. After expedited briefing and arguments,

22

we affirmed the circuit court's judgment in a June 30, 2026 order. We now explain the basis for that order.

## DISCUSSION

### I. STANDARD OF REVIEW

The primary issue before us—the interpretation of a county charter—is a question of law which we review without deference. *Prince George's County v. Thurston*, 479 Md. 575, 585 (2022). "We give no deference to the circuit court in determining whether its declaratory judgment is correct as a matter of law." *Id.*

We are also reviewing the Election Director's sufficiency finding. We review an administrative agency decision directly, "look[ing] through the decision[] of the circuit court[.]" *Comptroller of Maryland v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 359 (2022). The Election Director's determination here was a mixed question of law and fact to which we apply the "substantial evidence" standard of review, which requires that we determine if "there is sufficient evidence such that a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Crawford v. County Council of Prince George's County*, 482 Md. 680, 695-96 (2023) (citation modified) (quoting *County Council of Prince George's County v. Zimmer Dev. Co.*, 444 Md. 490, 573 (2015)).

### II. PRINCIPLES OF INTERPRETING A CHARTER

"A county charter is often likened to a local constitution[,]" *Thurston*, 479 Md. at 586, as it "is the organic, the fundamental law, establishing basic principles governing relationships between the government and the people, and among the various governmental

branches and bodies[,]" *id.* (quoting *Cheeks v. Cedlair Corp.*, 287 Md. 595, 607 (1980)).

As with interpreting a constitution,

> [t]he canons of construction used to interpret statutory language apply with equal force to the interpretation of a charter provision. The Court's primary objective is to ascertain the purpose and intent of the charter's framers. Because we assume that the framers express their intent in the text of the charter, we principally focus on the plain language of the challenged provision as the primary source of legislative intent.
>
> To discern legislative intent, we first assign the words of the charter provision their ordinary and natural meaning. This Court will not divine a legislative intention contrary to the plain language of the charter provision or judicially insert language to impose exceptions, limitations, or restrictions not evident in the plain language.
>
> The specific provision at issue must be read in the context of the charter and in relation to other charter provisions. We seek to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.

*Thurston*, 479 Md. at 586-87 (citation modified).

### III. WHETHER THE CDI ORDINANCE IS SUBJECT TO REFERENDUM

Charter § 308(a) provides for the submission to referendum of "a law, or part of a law, enacted pursuant to this Charter[,]" with four inapplicable exceptions. The parties dispute both whether the CDI Ordinance is "a law" and whether it was enacted pursuant to the Charter.

The Referendum Committee urges us to reverse the circuit court because, in its view, the CDI Ordinance was subject to referendum under § 308 of the Charter. To the Committee, "all *laws* are subject to referendum unless exempted in the Charter," and the "ordinary, popular and natural meaning of *law*," which the Committee gleans from broad

24

dictionary definitions, includes "ordinances." Thus, in its view, the CDI Ordinance, which is an exercise of the legislative authority of the County Council, is subject to referendum. The Committee also argues that ordinances are enacted pursuant to the Charter because the Charter is the source of the Council's legislative authority. Thus, the Committee contends, the only exceptions to the referendum power are the four specific categories of laws identified in Charter § 308(a).

The Referendum Opponents, on the other hand, believe that a "law" subject to referendum must be a law passed through the specific bill drafting and approval process set forth in Charter §§ 305 to 307—a process through which the CDI Ordinance did not go. They also argue that the CDI Ordinance "was adopted as a zoning map amendment pursuant to the procedures of the Land Use Article," not "pursuant to th[e] Charter," as required by § 308(a). And they argue that the referendum process does not reach zoning actions the County had authority to undertake as a commission county, which were never previously subject to referendum.

To support their respective positions, both the Committee and the Opponents point first to the plain language of the Charter, which they believe is unambiguously in their favor, and second to the Charter drafting history, which they believe confirms their reading of the Charter. We begin with the plain language.

Charter § 308 rests within Article 3, which begins by vesting the County Council with the authority to "enact public local laws . . . on all subjects that have been delegated to the County under the Maryland Constitution and by the laws of the State." Charter

§ 301. Charter § 305 addresses the enactment of "legislation." It provides that "[t]he Council may enact no law except by written Bill[,]" *id.* § 305(a), which is a "proposed act of the County Council resulting in a law or ordinance[,]" but is not "a resolution that is not intended to have the effect of law[,]" *id.* § 104(c). Thus, under the Charter, a law may be enacted only by a Bill; but a Bill may be used to enact either a law or an ordinance, but not a resolution.

Section 305 contains other requirements applicable to "Bills," including that they must embrace one subject, which must be described in its title, *id.* § 305(b); they may be introduced by one or more council members, *id.* § 305(c); if not rejected when introduced by a vote of five council members, they shall be scheduled for a public hearing with notice provided in advance as specified, *id.* § 305(d); they may be enacted "into law" by an affirmative vote of four council members, *id.* § 305(e); they may be substantively amended after introduction only with additional public notice and hearing, *id.*; and they become void unless "enacted within ninety days of introduction," *id.* § 305(f).

Charter § 306 requires the Council to deliver "legislation" to the County Executive for approval or veto within ten business days of its passage and provides the County Executive with the authority to veto "legislation" within ten business days of receiving it. *Id.* § 306(a). Unless timely vetoed, "legislation" is deemed to be approved. *Id.* However, the County Executive is prohibited from vetoing the Annual Budget and Appropriations Ordinance or an ordinance appointing a compensation review commission. *Id.* § 306(d).

Charter § 307 governs the effective date of "laws." With two exceptions, all "laws" are to "take effect sixty calendar days after enactment" unless the Council specifies a later date. *Id.* § 307(a). The exceptions are the Annual Budget and Appropriations Ordinance, which takes effect on the first day of the applicable fiscal year, and expedited legislation, which can take effect immediately. *Id.* § 307(a), (b).

Against this backdrop of addressing laws, certain ordinances, Bills, and legislation, Charter § 308 provides for the referral of "a law, or part of a law, enacted pursuant to this Charter" to the voters for referendum. *Id.* § 308(a). Section 308 refers several additional times to the proper subject of a referendum petition as a "law, or portion of a law." *Id.* § 308(b), (c), (d), (e). Section 308(a) expressly exempts four types of laws from the referendum power: (1) laws imposing taxes; (2) laws appropriating funds for current expenses; (3) laws prescribing council districts; and (4) laws adopting a compensation review commission. *Id.* § 308(a). Consistent with setting a standard effective date for laws as sixty days after enactment, *id.* § 307(a), a referendum petition must be filed with the Board of Elections "[n]o later than fifty-nine days following the date a law is enacted," *id.* § 308(c). Upon timely filing of a compliant petition, the challenged "law, or referred portion of law," will not take effect unless approved by a majority of voters. *Id.* § 308(d).

The final two sections of Article 3, §§ 309 and 310, respectively require the County Council to cause publication of "a fair summary of all laws enacted, amended, or repealed under this Charter" and codification, at least every ten years, of all "local laws of the

27

County which are of general application and continuing force[.]" The codification is to be called "The Code of Frederick County, Maryland." *Id.* § 310.

If we viewed Article 3 of the Charter in isolation, we would agree that the plain language is at least ambiguous concerning the scope of a "law, or part of a law" that is subject to referendum. The Charter does not explain its differing use of terms to describe actions of the County Council. On one hand, certain provisions of Article 3 appear to relate only to the Council's authority to enact public local laws, including § 301, which speaks only to that authority, § 305, which imposes requirements akin to those applicable to statutes enacted by the General Assembly, and § 310, which directs codification of all "local laws" as "The Code of Frederick County, Maryland." The County's practice since it became a charter county of establishing effective dates for Bills, but not ordinances, of at least 60 days after enactment is consistent with that interpretation. On the other hand, § 306 prohibits the County Executive from vetoing two specific ordinances and § 307 excepts one of those specific ordinances from the ordinary provisions related to the effective date of "laws," suggesting that the generic use of "laws" extends to at least some ordinances. And it is unclear from the plain language how the term "law" used in §§ 305, 307, and 308, may differ from the term "legislation" used to describe the scope of the County Executive's veto authority in § 306.

We are not, however, limited in our review to Article 3. Plain language review requires consideration of language in its full context. *Thurston*, 479 Md. at 587. As noted, Article 6 of the Charter specifically addresses land use by "adopti[ng]" "the provisions of

the Land Use Article . . . that governed land use in the County prior to the Effective Date of this Charter . . . as if they have been codified in the Code of Public Local Laws of Frederick County on the Effective Date of the Charter." Charter § 601(a). Thus, the plain language of the Charter states unequivocally that the provisions and procedures governing land use in the County were not going to change under the Charter. And, as discussed above at 3-4, those procedures already provided for zoning changes to be approved by ordinance, under the authority of the Land Use Article.

The description of the legislative power afforded to the County Council in Charter § 202 is consistent with that understanding. That section vests in the County Council "[a]ll the legislative powers which the County may exercise under the Maryland Constitution and laws of the State . . . subject to those powers *retained* by the people of the County as set forth in Section 308 of the Charter." *Id.* § 202 (emphasis added). Notably, before adoption of the Charter, the people of the County possessed the power of referendum with respect to the public local laws enacted by the General Assembly for the County, pursuant to Article XVI, § 3 of the Constitution of Maryland ("[A]ny Public Local Law for any one County . . . shall be referred by the Secretary of State only to the people of the County . . . upon a referendum petition of ten percent of the qualified voters of the County[.]"). But that power did not extend to zoning ordinances enacted under the authority of the Land Use Article. Thus, the power of referendum "retained" by the people of the County most naturally refers to the power to refer public local laws to referendum. There was no such existing power to refer zoning ordinances to referendum that could have been retained.

29

The Referendum Committee disagrees with this interpretation of Charter § 601. It points out that Division I of the Land Use Article, which contains the relevant provisions we have discussed, states that it "does not apply to charter counties[,]" Land Use § 1-401(a), except with respect to specific provisions listed in § 1-401(b). In a misconception that pervades several of its arguments, the Committee thus argues that adoption of the Land Use Article in the Charter necessarily includes only those provisions that apply by the terms of that Article to charter counties. But that ignores the plain language of Charter § 601. It would also render that provision superfluous, interpreting it to adopt only those provisions of the Land Use Article that state law already mandates. Instead, Charter § 601 adopts as the law of the County the provisions of the Land Use Article that applied to the County *before* adoption of the Charter, i.e., those provisions that were applicable to it as a commission county. And as the circuit court found, and as no party has disputed, before adoption of the Charter, zoning ordinances in the County were adopted by ordinance, subject to judicial review as provided in the Land Use Article, and not subject to referendum.

Accordingly, we agree with the circuit court's conclusion that the CDI Ordinance is not subject to referendum pursuant to Charter § 308. The structure of the Charter makes clear that zoning ordinances such as the CDI Ordinance were intended to be handled in the same manner following the effective date of the Charter as they had been before that date. Reading the provisions of Article 3 in the context of the rest of the Charter, especially Article 6, we do not perceive any ambiguity.

30

The Referendum Committee points out that certain other provisions of the Charter suggest that some ordinances might be subject to referendum if they were not expressly excluded in § 308(a). For example, Charter § 207 provides for the establishment of a compensation review commission by ordinance, Charter § 214(d) references an ordinance establishing Council Districts, and Charter § 506(d) provides for the adoption of the Annual Budget and Appropriations Ordinance, all of which are expressly excluded from the referendum power. However, as the Referendum Opponents point out, the latter two of those provisions create alternate pathways for certain administrative or executive actions to become law, including by ordinance if not otherwise disturbed by the County Council. *See* Charter § 214(b) (providing that the Redistricting Commission's plan will "become law" unless the County Council enacts legislation establishing different council district boundaries); *id.* § 506(d) (permitting the Executive's proposed budget to "become law" if the County Council fails to adopt a different budget by May 31 of each year). Moreover, none of those provisions are informed by the plain language of Article 6. In any event, because our analysis is grounded, in part, on the plain language of Article 6, we take no position concerning whether ordinances other than zoning ordinances such as the CDI Ordinance may be subject to the referendum power reserved to the people in Charter § 308.

For similar reasons, we reject the Referendum Committee's arguments based on the premise that "laws" and "ordinances" are not mutually exclusive. Section 307(a) sets the effective date for the Annual Budget and Appropriations Ordinance and a different effective date for "[a]ll other laws." The Committee takes that to mean that "law" is

31

inclusive of "ordinance," at least in that paragraph. The Committee also argues that the "or" in "law or ordinance" in the definition of "Bill" is not disjunctive, but rather highlights an "ordinance" as a particularly salient example of a "law." *See* Charter § 104(c). And the Committee lastly posits that, under § 202(a), "[a]ll the legislative powers which the County may exercise under the Maryland Constitution and laws of the State are vested in the Council," and the Council is vested with the powers to enact "ordinances" under the Home Rule Amendment and the Express Powers Act. *See* Md. Const. art. XI-A; Local Gov't §§ 9-201(6), 10-202(a), 10-204, 10-206(a). We accept that a general reference to laws may, depending on context, include ordinances. But, as we have explained, with respect to the Frederick County Charter, the term "laws" in § 308(a) does not include zoning ordinances such as the CDI Ordinance. Our holding is narrow and limited only to that provision.

Although we conclude that the Charter language is unambiguous, we may nonetheless consult legislative history "both as a check on our plain language reading and to eliminate alternate theories of" intent. *See Wash. Gas Light Co. v. Maryland Pub. Serv. Comm'n¸* 460 Md. 667, 686 (2018). Here, we conclude that the legislative history of the Charter supports our interpretation.

The Charter Board met numerous times during the Charter drafting process in 2011 and 2012. The extent of the referendum power was specifically discussed at a meeting in December 2011 during which members of the Board discussed the possibility of expressly excepting zoning from the referendum power but decided not to do so for two reasons.

32

First, they discussed that by expressly adopting the land use provisions in the Maryland Code (then in former Article 66B, later in the Land Use Article) as they applied to the County at that time, the referendum power would not apply to zoning. Second, they were concerned that expressly excepting zoning might "confuse the public into thinking [some]thing about land use was changing." The Charter Board discussed the matter again at meetings in January 2012 and February 2012. Taking the discussions as a whole, it is apparent that the Board did not intend the referendum power to extend to zoning ordinances the County was already empowered to adopt as a commission county pursuant to the Land Use Article. Although the Board considered expressly exempting zoning from the referendum power, it decided against doing so, but only because it thought its express adoption of the Land Use Article as it then applied would have the same effect.

Further evidence supporting that interpretation is contained in a contemporaneous "Charter Highlights" document prepared by the Charter Board that still resides on the County's website. *Charter Highlights*, Frederick County Gov't, https://www.frederickcountymd.gov/5745/Charter-Board-History#docaccess-9eaa8c1f78c2a51f4a2f4414de474cda55bf81b5adf6f0ca1335d21bed7f23d9, *archived at* https://perma.cc/2V87-H424. Under the heading "Planning and Zoning/Land Use," the document states that Article 66B, the predecessor to the Land Use Article, "governs land use. The laws that established the policies *and procedures* by which land use decisions have been made in the county will continue to control land decisions after the adoption of the Charter until this requirement in the Charter is amended by voters." *Id.* (emphasis

33

added).  The document also discusses the "Legislative Process" set forth in Article 3 as applicable to "Bills," without using the terms "laws" or "ordinances," and, with respect to the referendum power, states that "voters can petition most Bills to a referendum[.]"  *Id.*

In sum, we agree with the circuit court that the CDI Ordinance is not subject to referendum.

## IV.  THE SUFFICIENCY OF THE PETITION

Charter § 308(b) requires that any referendum petition shall (1) "meet the requirements of State law" and (2) "contain the full and accurate text of the law . . . that is subject to the petition" on "each paper" of the petition.  The State law requirements for petitions are in Title 6 of the Election Law Article.  *See* Elec. Law §§ 6-101 – 6-211.  Notably, under § 6-201(c), each signature page must contain either "a fair and accurate summary of the substantive provisions of the proposal" or "the full text of the proposal[.]"  *Id.* § 6-201(c)(2).  However, providing "a fair and accurate summary" of the proposal is not an option under the Charter, which requires a "full and accurate" reproduction of the law as part of the petition.  Charter § 308(b).  Here, the CDI Ordinance contained one-and-one-half pages of text and two maps attached as exhibits.  The question before us is whether the reproductions of the CDI Ordinance on the back of each petition signature page meet the Charter standard of a "full and accurate" reproduction.

We "often look to dictionary definitions . . . to identify the 'ordinary and popular meaning' of the terms[.]"  *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024) (quoting *Comptroller of Md. v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 390 (2022)).

34

"Full" means "not lacking or omitting anything; complete[.]" *Full*, New Oxford American Dictionary 701 (3d ed. 2010). And "accurate" means "faithfully or fairly representing the truth about someone or something[.]" *Accurate*, New Oxford American Dictionary 11. Applying those common definitions, a "full and accurate" reproduction of a law must faithfully represent the truth of the law and be free of any material alterations.

No Maryland appellate court has interpreted the phrase "full and accurate" in the context of Charter § 308(b). However, the Appellate Court of Maryland has interpreted the requirement for a petition under State law. In *Gray v. Howard County Board of Elections*, 218 Md. App. 654 (2014), the Appellate Court interpreted the phrase "fair and accurate summary" in the context of Election Law § 6-201(c). The Appellate Court concluded that such a summary "must be free from misleading tendency, amplification, or omission to permit voters to exercise intelligent and enlightened judgment as to whether to sign the referendum petition. In short, it must be, in the words of [Election Law] § 6-201(c)(2)(i), fair and accurate." *Id.* at 665 (quotation and internal quotation marks omitted). Although the court in *Gray* examined a summary of the challenged law, not a reproduction as here, we find that these principles support our understanding of a "full and accurate" reproduction of the law and are helpful in analyzing whether the reproduction of the ordinance at issue complies with the requirements of Charter § 308(b).

We turn to a comparison between the maps attached to the CDI Ordinance and those included with the petition. The first map shows the outline of the Overlay Zone. The

35

version on the left is the version that was attached to the CDI ordinance. The version on the right was attached to the petition:[6]

---

[6] The record contains thousands of pages of signed black-and-white petitions with varying degrees of legibility ranging from somewhat legible to not legible. Here, we use maps to which the Referendum Committee pointed us, which are apparently the maps submitted to the Board of Elections for advance determination on January 21, 2026.



**Council Adopted
Critical Data
Infrastructure (CDI)
Overlay Zone**

☐ Council Adopted CDI Overlay Zone

| CDI Acres | CDI % of County |
|-----------|-----------------|
| 2,614.9 | 0.61 |

Projection: NAD 1983 State Plane Maryland FIPS 1900 FeetWhile efforts have been made to ensure the accuracy of this map, Frederick County accepts no liability or responsibility for errors, omissions, or positional inaccuracies in the content of this map. Reliance on this map is at the risk of the user. This map is for illustration purposes only and should not be used for surveying, engineering, or site-specific analysis. Printed 1/5/2026

0   0.25   0.5   1 Miles

MAPID:540



**Council Adopted
Critical Data
Infrastructure (CDI)
Overlay Zone**

Council Adopted CDI Overlay Zone

| CDI Acres | CDI % of County |
|-----------|-----------------|
| | |

We agree with the circuit court that two critical features are missing from the black-and-white reproduction of the Overlay Zone map. First, by not showing the yellow boundary lines delineating the Overlay Zone, the reproduction does not clearly depict that boundary. There are no lines, no shading, nor any other features of the map that clearly outline what is and is not included in the Overlay Zone. Indeed, it is impossible to know that there is meant to be an outline at all because the yellow box in the key at the bottom of the page does not exist in the black-and-white reproduction. Second, the surrounding street names are illegible, making it difficult to identify exactly where the Zone is located.

The second map uses ten colors to delineate zoning designations within and around the Overlay Zone. The version on the left is the version that was attached to the CDI ordinance. The version on the right was attached to the petition:

38



**Council Adopted Zoning**

| | | |
|---|---|---|
| A – Agricultural | PUD – Planned Unit Development | MM – Mineral Mining |
| RC – Resource Conservation | VC – Village Center | Ie - Institutional |
| R1 – Low Density Residential | GI – General Industrial | |
| R3 – Low Density Residential | LI – Limited Industrial | |

Frederick County, Maryland
Division of Planning and Permitting

Projection: NAD 1983 State Plane Maryland FIPS 1900 Feet/While efforts have been made to ensure the accuracy of this map, Frederick County accepts no liability or responsibility for errors, omissions, or positional inaccuracies in the content of this map. Reliance on this map is at the risk of the user. This map is for illustration purposes only and should not be used for surveying, engineering, or site-specific analysis. Printed 1/5/2026

0  0.1  0.2     0.4
Miles

N



Council Adopted Zoning

39

The black-and-white reproduction does not show the different zones. The only mostly clear depiction in the black-and-white reproduction is of the area zoned as General Industrial, the darkest zone on the map. Areas designated Light Industrial—also open to development if within the Overlay Zone—appear indistinguishable from the areas around them, including those designated Agricultural. And, as with the first map, the key is largely indiscernible.

The Referendum Committee argues that "the color of the zoning maps was immaterial" because "[w]hat matters to the voters are the boundaries of the zone—nothing more." However, the maps provided do not accurately depict the boundaries of the zone, and even if they did, we disagree that the boundaries are all that would matter to voters. The reproduction eliminated substantive information that the zoning map existed to convey, namely, the different zoning designations for land in and around the Overlay Zone.

The Referendum Committee next argues that "the essential purpose of Election Law § 6-201 is to apprise the voter, in plain English, of the law at issue and the goal of the referendum[.]"[7] The Committee highlights that in addition to the black-and-white

---

[7] In support of this argument, the Referendum Committee points to recent amendments to Election Law § 6-201. Effective June 1, 2026, § 6-201(c)(2) now requires that the "fair and accurate summary" be "written in plain, clear language that[] . . . a voter can easily understand[,]" "does not explain the legal mechanism providing for the policy change[,]" and "does not contain legal jargon or use double negatives or the passive voice[.]" 2026 Md. Laws, Ch. 439. The Committee contends that this amendment demonstrates the "intended spirit and purpose of the statute[,] . . . which is to apprise the voter of the issue in plain English and remove abstract 'legal jargon' and 'legal mechanisms' from the analysis." But, as the Committee admits, this argument was not

40

reproductions on the petition itself, the petition circulators each carried a full color physical copy of the CDI Ordinance and a QR code linked to a digital copy of the CDI Ordinance, which it posits "sufficiently complied with the purpose" and "substance" of Election Law § 6-201. However, meeting the requirements of § 6-201 is necessary but insufficient to comply fully with Charter § 308(b). The Charter requires that the petition itself contain a "full and accurate" reproduction of the law being challenged, and the reproductions of the maps failed to satisfy that requirement.[8]

Lastly, the Referendum Committee argues that we owe deference to the Election Director's conclusion that there was no deficiency with the form of the referendum petition. Under Election Law § 6-206(c), the chief election official must determine whether the petition meets certain criteria, including whether "the requirements relating to the form of the petition" were met. Elec. Law. § 6-206(c)(4). Before the filing of the petition, the Election Director made an advance determination under Election Law § 6-202 that "the Petition is sufficient as to format only," without further explanation, and later echoed that conclusion when the referendum petition was filed.

We agree with the Referendum Committee that whether the petition was sufficient is a mixed question of law and fact. The Election Director had to review the maps as

___

raised in or decided by the circuit court. *See* Md. Rule 8-131(b)(1) ("[T]he Supreme Court ordinarily will consider only an issue . . . that has been preserved for review[.]").

[8] The parties also disagree about the fullness and accuracy of the actual text of the Ordinance in the petition. Because of our conclusion regarding the maps, we do not reach any arguments related to the reproduced text.

41

printed in the CDI Ordinance, compare those maps to the reproduction on the referendum petition, and determine whether the reproduced maps are "full and accurate" depictions of the ordinance. That review involved more than a pure legal determination. *See Crawford v. County Council of Prince George's County*, 482 Md. 680, 694-95 (2023) ("Questions of law involve only the application or interpretation of law, regardless of the particular facts of a case. . . . Mixed questions of law and fact, in contrast, arise when an agency has correctly stated the law, its fact-finding is supported by the record, and the remaining question is whether the agency has correctly *applied* the law to the facts."). Accordingly, we must decide if "there is sufficient evidence such that a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Id.* at 695-96 (citation modified) (quoting *County Council of Prince George's County v. Zimmer Dev. Co.*, 444 Md. 490, 573 (2015)).

No such evidence exists here. The Election Director made no factual findings about the maps and provided no explanation of her conclusion that they were sufficient. Given that the uncontradicted evidence in the record demonstrates that the reproduced maps did not apprise voters of either the accurate area of the Overlay Zone or the zoning designations of the areas within and immediately surrounding that zone, we conclude that the "substantial evidence" standard was not satisfied here. In sum, we agree with the circuit court that the petition was insufficient because it did not contain a full and accurate reproduction of the CDI Ordinance.

42

We add two cautionary notes about our holding. First, we do not hold that when a law petitioned to referendum includes color text or images, those portions must be reproduced in color on each page of the petition for the petition to be sufficient. In this case, the color aspects of the images are essential to understanding what they depict and, therefore, to understanding the CDI Ordinance. That will not necessarily be so in every case.

Second, the requirement in Charter § 308(b) that a referendum petition always contain a "full and accurate" reproduction of an ordinance on "every paper" could be problematic in connection with a longer law. Here, the Referendum Committee did not argue that compliance with that requirement was impossible, and the fault we find with the reproduction is not its size but its indistinct black-and-white images. But it is not difficult to imagine a law so lengthy that reproducing a full and accurate version on the back of a reasonably sized sheet of paper would be impossible. At oral argument, the Referendum Opponents suggested that it would be appropriate in such a circumstance for a referendum organizer to seek an advance declaration from a court that it could proceed along a different path. That is one option. We do not foreclose others. But it cannot be the case that the length of a law insulates it from referendum review. We suggest that the Frederick County Council consider whether the requirement to reproduce on "each paper" of a referendum petition a full and accurate copy of every law referred to referendum should be changed.

**CONCLUSION**

We hold that, pursuant to the Frederick County Charter, Ordinance 26-01-001 was not subject to referendum. We further hold that, even if Ordinance 26-01-001 were subject to referendum, the referendum petition was deficient because it failed to provide a "full and accurate" reproduction of the Ordinance, in violation of Charter § 308(b). For those reasons, in a June 30, 2026 per curiam order we affirmed the judgment of the Circuit Court for Frederick County.

Justice Harrell advises that, because he concurs with the reasoning in part IV of this opinion, as an independent and conclusive basis for affirming the judgment of the circuit court, he would not reach or decide the Referendum Committee's first question presented, i.e., whether the CDI Ordinance was subject to referendum pursuant to the Charter.